IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

VINCE LEACH, AN INDIVIDUAL AND QUALIFIED ELECTOR; SANDRA
SEVERSON, AN INDIVIDUAL AND QUALIFIED ELECTOR; VICKI BUCHDA, AN
INDIVIDUAL AND QUALIFIED ELECTOR; ARIZONANS FOR BETTER
HEALTHCARE, A NONPROFIT CORPORATION; ARIZONA MEDICAL
ASSOCIATION, INC., A NONPROFIT CORPORATION; HEALTH SYSTEM
ALLIANCE OF ARIZONA, A NONPROFIT CORPORATION; ARIZONA NURSES
ASSOCIATION, A NONPROFIT CORPORATION,
*Plaintiffs/Appellees,*

*v.*

KATIE HOBBS, ARIZONA SECRETARY OF STATE AND ARIZONANS FED UP
WITH FAILING HEALTHCARE (HEALTHCARE RISING AZ), A POLITICAL
ACTION COMMITTEE,
*Defendants/Appellants.*

ARIZONANS FED UP WITH FAILING HEALTHCARE (HEALTHCARE RISING
AZ), A POLITICAL ACTION COMMITTEE,
*Plaintiff/Appellant,*

*v.*

KATIE HOBBS, IN HER OFFICIAL CAPACITY AS ARIZONA SECRETARY OF
STATE,
*Defendant/Appellant.*

No. CV-20-0233-AP/EL
Filed March 31, 2021

Appeal from the Superior Court in Maricopa County
The Honorable Pamela S. Gates, Judge
The Honorable M. Scott McCoy, Judge
No. CV2020-007961; CV2020-009087
**AFFIRMED**

COUNSEL:

Brett W. Johnson, Eric H. Spencer, Colin P. Ahler, Tracy A. Olson, Ian R. Joyce, Snell & Wilmer L.L.P., Phoenix, Attorneys for Vince Leach, Sandra Severson, Vicki Buchda, Arizonans for Better Healthcare, The Arizona Medical Association Inc, Health System Alliance of Arizona, and Arizona Nurses Association

James E. Barton, II, Jacqueline Mendez Soto, Torres Law Group, PLLC, Tempe, Attorneys for Arizonans Fed Up With Failing Healthcare (Healthcare Rising AZ)

Paul F. Eckstein, Daniel C. Barr, Austin C. Yost, Margo R. Casselman, Perkins Coie LLP, Phoenix, Attorneys for Amici Curiae Kathy Hoffman, et al.

JUSTICE LOPEZ authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER and JUSTICES BOLICK, GOULD, BEENE, and MONTGOMERY joined. JUSTICE BOLICK authored a concurring opinion.

JUSTICE LOPEZ, opinion of the Court:

¶1 We explain today the reasons for our prior decision order disqualifying the "Stop Surprise Billing and Protect Patients Act" ballot initiative ("the Initiative") from the November 2020 general election ballot. We hold that a registered petition circulator, by "de-registering" pursuant to provisions of the Arizona Secretary of State 2019 Election Procedures Manual ("2019 EPM"), may not evade the statutory requirement in A.R.S. § 19-118(E) that registered circulators subpoenaed in an election challenge appear for trial. We further hold that the subpoenas were properly served

2

on the circulators, and, as a result, signatures were stricken, leaving an insufficient number to qualify for the ballot.

¶2        Because our opinion affirming the trial court's disqualification of signatures gathered by non-appearing subpoenaed circulators is dispositive as to whether the Initiative would have appeared on the ballot, we decline to consider, as moot, the trial court's ruling regarding the Initiative's 100-word summary or the Challengers' cross-appeal.

## I. BACKGROUND

¶3        The people retained the right to initiate constitutional amendments and propose statutes when delegating legislative authority to the Arizona legislature. *Stanwitz v. Reagan*, 245 Ariz. 344, 346 ¶ 2 (2018); *see* Ariz. Const. art. 4, pt. 1, § 1(1)–(2). "To exercise this right, a sufficient number of qualified electors must sign verified petitions in support of the proposed measure and submit them as prescribed by law." *Stanwitz*, 245 Ariz. at 346 ¶ 2; *see also* A.R.S. tit. 19 ch. 1 (setting forth the specific procedure by which such petitions are to be submitted and processed). A constitutional initiative requires signatures from 15% of all qualified electors. *Stanwitz*, 245 Ariz. at 346 ¶ 2; *see* Ariz. Const. art. 4, pt. 1, § 1(2). "For a statewide initiative, the Arizona Secretary of State (the 'Secretary') is required to review the submitted petitions, remove petition sheets and individual signatures on petition sheets that fail to comply with statutory requirements, and count the remaining signatures on the petition sheets." *Stanwitz*, 245 Ariz. at 346 ¶ 2; *see* A.R.S. § 19-121.01(A). If, after satisfying other Title 19 requirements not relevant here, the Secretary determines that the initiative is supported by a sufficient number of valid signatures, the measure is placed on the ballot. *Stanwitz*, 245 Ariz. at 346 ¶ 2; *see* A.R.S. §§ 19-121.04(B), -125.

¶4        Proponent Arizonans Fed Up with Failing Healthcare ("the Committee") is a political action committee that sought to place the Initiative on the ballot for the 2020 general election. The Committee filed signature petition sheets with the Secretary to qualify the Initiative for the November 2020 ballot. The Committee needed at least 237,645 valid signatures to qualify the Initiative for the ballot. The Committee ultimately submitted petition sheets containing more than the required minimum number of signatures.

¶5        The Leach Challengers ("Challengers") filed a complaint pursuant to A.R.S. § 19-118(F) on July 10, 2020, challenging the validity of certain petitions based on various objections to petition circulators and signatures.  On that same day, the Committee cancelled all its circulators' registrations.  Before trial, Challengers subpoenaed 332 out of 1167 petition circulators to appear as witnesses.  Challengers served the circulators by delivering subpoenas to the Committee's address on August 4.  On August 7, the matter proceeded to trial.  Due to the COVID-19 pandemic and pursuant to court administrative orders, witnesses were not permitted to report to the courthouse or to testify in-person at trial.

¶6        Because of the prohibition on in-person testimony, the trial court implemented procedures to ensure that subpoenaed circulators could appear at trial via video or telephone.  To facilitate this process, the court ordered that trial begin on August 6, for the limited purpose of checking in circulator witnesses.  The parties stipulated to this procedure on July 30.  At check-in, the circulators were provided a "group number," a date and time for their trial testimony, and login information for their trial appearances.  The court also ordered the parties to provide witnesses with the court's telephone number in the event of technical difficulties with their virtual appearance.

¶7        Despite these stipulated procedures, ninety-four subpoenaed circulators failed to appear at trial.  After Challengers moved to strike the non-appearing circulators' signatures, the Committee objected, arguing that the circulators were not required to appear for trial pursuant to § 19-118(E) because they had been "de-registered" and that valid subpoenas were not properly served.

¶8        The court rejected the Committee's contention that "de-registration" of a circulator pursuant to a provision in the 2019 EPM prior to service of a subpoena eliminated the consequence of failing to appear, reasoning that such a reading of the statute would allow a committee to avoid the consequences of failing to appear and testify by "simply de-registering all circulators before service of a valid subpoena."

¶9        The Committee also argued that service of process problems prevented the court from disqualifying non-appearing circulators' signatures:  (1) Challengers did not properly serve the circulators as the

subpoenas did not provide a reasonable time to comply; (2) the Secretary did not provide the subpoenas to the Committee electronically; and (3) the subpoenas failed to specify a check-in time. The court rejected all of these arguments.

¶10 The court noted (1) that the Committee acknowledged receipt of the subpoenas and the associated "tickets"—which accompanied the subpoenas and included check-in time, date, and access information for each circulator—and that they were served with adequate time for the circulators to comply and appear at trial; (2) that Rule 45(a)(1) of the Arizona Rules of Civil Procedure did not require that a subpoena or its associated "ticket" be provided in electronic form and that the Committee's counsel was served with a complete set of trial subpoenas with tickets and instructions on accessing the virtual courtroom on August 4; and (3) that the parties' counsel stipulated to the virtual check-in process on July 30, and the court followed up by sending the access codes the following day.

¶11 The court exhibited further flexibility by declining to disqualify circulators' signatures if they appeared for trial but failed to produce required documents. The court credited numerous witnesses' assertions that they were unaware of the obligation to produce documents and that no instruction was given on how to produce the documents to the court. The court ruled that, given these circumstances and the short timeframe between the subpoena and the trial, these circulators' signatures were not subject to invalidation under § 19-118(E). Moreover, the court noted that the petitions requested from the circulators are public records and that § 19-118 "cannot be used as a tool to require the production of already produced documents absent a finding of good cause."

¶12 The court appointed a special master who ultimately concluded that only 227,215 of the obtained signatures were valid. The trial court agreed and incorporated its rulings to disqualify another 5679 signatures—ultimately holding that the Committee had only gathered 221,536 of the requisite 237,645 valid signatures and was therefore approximately 16,000 signatures short of qualifying for the ballot.

¶13 The Committee and Challengers filed expedited appeals in this Court pursuant to A.R.S. § 19-122(A). We have jurisdiction over this matter pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. § 19-122(C).

## II. DISCUSSION

**¶14** The Committee argues that signatures gathered by registered circulators may not be disqualified pursuant to § 19-118(E) if the circulators "de-registered" pursuant to provisions of the 2019 EPM before the signatures are challenged, and that the subpoenas were not properly served on the circulators. We address, in turn, each argument.

### A.

**¶15** We recently rejected facial and as-applied constitutional challenges to § 19-118(E),[1] the statute at issue. We reasoned that the statute's requirement that registered petition circulators subpoenaed in an election challenge appear for trial "'does not unreasonably hinder or restrict' the initiative process and it 'reasonably supplements the constitutional purpose' by fostering the integrity of the process." *Stanwitz*, 245 Ariz. at 346 ¶ 1 (quoting *Direct Sellers Ass'n v. McBrayer*, 109 Ariz. 3, 5 (1972)). We reiterate the importance of registered circulators because "[t]he circulator is the only person in the process who is required to make a sworn statement and is, therefore, the person under the greatest compulsion to lend credibility to the process." *Id.* at 349 ¶ 18 (quoting *W. Devcor, Inc. v. City of Scottsdale*, 168 Ariz. 426, 432 (1991)).

**¶16** Section 19-118(E) provides, in part, that:

> If a registered circulator is properly served with a subpoena to provide evidence in an action regarding circulation of petitions and fails to appear or produce documents as provided for in the subpoena, all signatures collected by that circulator are deemed invalid.

**¶17** Based on the elements of the statute, we conclude that a three-part analysis is appropriate to determine whether a party complied with § 19-118(E). First, is the person a "registered circulator"? Second, was the circulator properly served? Third, did the circulator fail to appear or

---

[1] In *Stanwitz*, we considered challenges to A.R.S. § 19-118(C), the identical provision now renumbered as A.R.S. § 19-118(E).

produce documents as requested in the subpoena?  This case concerns the first two requirements.

**B.**

¶18        The Committee argues that signatures gathered by "de-registered" circulators may not be disqualified pursuant to § 19-118(E) because "strict compliance" under A.R.S. § 19-102.01(A) limits application of § 19-118(E) to circulators registered at the time of a challenge.  We disagree.

¶19        Registration and regulation of circulators is governed by statute.  Section 19-118(A) provides that the Secretary "shall establish in the instructions and procedures manual issued pursuant to § 16-452 a procedure for registering circulators, including circulator registration applications, and shall publish on a website maintained by the [Secretary] all information regarding circulators that is required pursuant to this section."  Section 19-118(B)(3), in turn, requires that circulators submit "[a] statement that the circulator consents to the jurisdiction of the courts of this state in resolving any disputes concerning the circulation of petitions by that circulator."  Circulators must also provide an address "at which the circulator will accept service of process related to disputes concerning circulation of that circulator's petitions."  § 19-118(B)(4).  A circulator must attest to the accuracy of this information, under criminal penalty, in a notarized affidavit.  § 19-118(B)(5).  Thus, the statutory text manifests the legislature's plain intent: circulators must be available for court proceedings if the signatures they gather are challenged.

¶20        The language and purpose of the statute rebut the Committee's position.  In context, the reference to a "registered circulator" in § 19-118(E) must necessarily apply to circulators who are registered *at the time they circulate the petitions*, regardless of whether they "de-registered" at a later time.  Crucially, there is no statutory procedure for a circulator to de-register.  Although the EPM provides for cancellation of a circulator's registration—putting aside for the moment whether the EPM may abrogate a statutory duty—it does not even purport to discharge a circulator's duty to comply with the statutory obligation to honor a subpoena.  *See* 2019 EPM at 253.  The Committee's approach would permit a committee to avoid any obligation under § 19-118 to present its circulators to testify under subpoena by simply cancelling circulator registrations before a challenge.  The

Committee's interpretation of the statute is untenable and, thus, does not implicate the strict compliance standard under § 19-102.01(A).[2]

**¶21** Further, an EPM regulation that exceeds the scope of its statutory authorization or contravenes an election statute's purpose does not have the force of law. *See, e.g.*, *McKenna v. Soto*, No. CV-20-0123-AP/EL, 2021 WL 712966, *4 ¶¶ 20–21 (Ariz. Feb. 17, 2021) ("Because the statute that authorizes the EPM does not authorize rulemaking pertaining to candidate nomination petitions, those portions of the EPM relied upon . . . to invalidate the signatures without a complete date were not adopted 'pursuant to' § 16-452."). Thus, a registered circulator may not evade § 19-118(E)'s requirement that a circulator answer a properly served subpoena merely by "de-registering." Any other interpretation would vitiate the statute's purpose to foster the integrity of the initiative process. *See Stanwitz*, 245 Ariz. at 346 ¶ 1.

## C.

**¶22** The Committee next argues that signatures gathered by registered circulators may not be disqualified pursuant to § 19-118(E) because the circulators were not properly and timely served with subpoenas.

**¶23** We review a trial court's denial of a motion to quash a subpoena duces tecum for an abuse of discretion. *Schwartz v. Superior Court*, 186 Ariz. 617, 619 (App. 1996).

**¶24** "Service of process is effected under [§ 19-118] by delivering a copy of the subpoena to that person individually, by leaving a copy of the subpoena with a person of suitable age or by mailing a copy of the subpoena to the committee by certified mail to the address provided." § 19-118(B)(4). Section 19-118 does not impose any time requirements for service of process regarding subpoenas. Section 19-118(E), however, requires that a registered circulator be "properly served." We have evaluated whether service of a subpoena on a registered circulator is proper under § 19-118(E) by applying

---

[2] Because we resolve this issue on statutory grounds, we need not consider the constitutionality of the strict compliance requirement of § 19-102.01(A). *See, e.g.*, *Stanwitz*, 245 Ariz. at 348 ¶ 12.

the requirements of Rule 45 of the Arizona Rules of Civil Procedure. *See, e.g.*, *Stanwitz*, 245 Ariz. at 351 ¶ 28. Rule 45 requires proof of service of the subpoenas, Ariz. R. Civ. P. 45(d)(3), and to do so within a "reasonable time to comply," Ariz. R. Civ. P. 45(e)(2)(A)(i).

¶25 Here, the Committee's arguments concerning defective and untimely service of the subpoenas are unavailing. First, the Committee failed to file a motion to quash the subpoenas pursuant to Rule 45. Ariz. R. Civ. P. 45(e)(2)(A)(i) ("On timely motion, the court . . . must quash or modify a subpoena if it . . . fails to allow a reasonable time to comply."). Second, as noted, *supra* ¶ 10, the Committee acknowledged receipt of the subpoenas and the associated "tickets" and that they were served with adequate time for the circulators to comply and appear at trial. Third, Challengers sent a litigation hold letter to all 1167 registered circulators on July 17 and Fieldworks, the company who employed most of the circulators, began alerting them they might be required to appear at trial well before the final list of 332 circulators was disclosed on August 3. Fourth, Rule 45(a)(1) does not require that a subpoena or its associated "ticket" be provided in electronic form. In any event, the Committee's counsel was served with a complete set of trial subpoenas with tickets and instructions on accessing the virtual courtroom on August 4. Fifth, the parties' counsel stipulated to the virtual check-in process on July 30, and the court followed up by sending the access codes the following day. Thus, because the trial court implemented several effective procedures to facilitate timely service of, and compliance with, the subpoenas; trial appearances were virtual; and the court exhibited flexibility in accommodating circulators, the record belies the Committee's claim of inadequate service and notice. We conclude that the Committee and circulators were provided sufficient notice of the subpoenas.

### D.

¶26 The Committee contends that Challengers "abused" § 19-118(E)'s circulator subpoena process, but it did not raise a constitutional challenge to the application of the statute. In *Stanwitz*, initiative proponents raised an "as applied" challenge to § 19-118(E), alleging that initiative challengers essentially used the subpoena process as a procedural trap to disqualify non-appearing circulators' signatures because the challengers "had no intention of actually relying on testimony by [the subpoenaed circulators]" as the testimony was unnecessary or

irrelevant to the challengers' claims. 245 Ariz. at 350 ¶ 22. There, we rejected the argument because the challengers issued subpoenas to only 15 circulators—approximately .6% of all circulators—and the trial court ruled that the circulators' failure to testify prejudiced the fact-finding process on material issues. *Id.* at 347 ¶ 6, 350 ¶ 23. Here, Challengers issued notably more subpoenas to circulators—approximately 30% (332 out of 1167) of the Committee's circulators. But, as in *Stanwitz*, the court carefully assessed the importance of each subpoenaed circulator's testimony to the fact-finding process and concluded that "the failure to appear by the identified circulators materially prejudiced the fact-finding process."

¶27        We reiterate that § 19-118(E) serves a critical function in fostering the integrity of the initiative process. *Id.* at 346 ¶ 1. Our courts, however, must remain vigilant to ensure that initiative challengers do not abuse the subpoena provision in § 19-118(E) by wielding it as a procedural sword to disqualify petition signatures rather than using it as a tool to advance the fact-finding process.

## III. CONCLUSION

¶28        For the reasons set forth above, we affirm the trial court's judgment disqualifying the Initiative from the November 2020 ballot. We also deny Challengers' request for attorney fees.

BOLICK, J., concurring:

¶29          I join fully in the Court's opinion.  Although we need not reach the proposed initiative's 100-word summary, I do so to provide guidance to future initiative sponsors.  *See Molera v. Hobbs* (*Molera II*), 250 Ariz. 13, 19 ¶ 7 (2020) ("Further guidance on what [A.R.S.] § 19-102(A) does and does not require is warranted . . . .").  Because an initiative's summary must provide potential petition supporters with fair notice of the measure's principal provisions before they sign, I would affirm the trial court's conclusion that the summary here was misleading and confusing, which accordingly would provide an additional basis to enjoin placing the measure on the ballot.

¶30          Section 19-102(A) requires initiative sponsors to place on petition signature sheets "a description of no more than one hundred words of the principal provisions of the proposed measure."  A.R.S. § 19-102(A).  As we recently observed in *Molera II*, where we approved the petition summary for the Invest in Education initiative that was subsequently enacted, a summary may run afoul of the requirement in either or both of two ways: it may omit a principal provision of the initiative, 250 Ariz. at 19 ¶ 8, or it may present objectively false or misleading information or obscure the principal provisions' basic thrust.  *Id.* at 20 ¶ 13.  As the Court explained, "although sponsors are free to describe the measure in a positive way and emphasize its most popular features, they may not engage in a 'bait and switch' in which the summary attracts signers but misrepresents or omits key provisions."  *Id.*

¶31          This can be a difficult task, given the complexity of many proposed initiatives and the fact that the sponsors have a strong interest in persuading voters to sign the petitions.  But accuracy is absolutely essential, as few voters are likely to read the entirety of a proposed initiative, and thus the written summary (and whatever the signature gatherer orally tells them) will often be the only information voters have before deciding whether to sign the petition to place a proposed law on the ballot.

¶32        For this initiative, the sponsors attached to the petitions this 93-word summary:

> This Act prohibits insurers from discriminating based on preexisting conditions; bans surprise out-of-network bills, redefined as bills above in-network cost sharing requirements; bans balance bills for ambulance care; and amends the surprise bill dispute process. Insurers must reimburse providers, facilities and ambulances at specified rates. Sets new minimum wages for direct care workers at private hospitals by requiring raises of at least five percent for each of four years. Private hospitals must meet national safety standards regarding hospital acquired infections, under Department of Health Services enforcement authority, funded by fees paid by private hospitals.

¶33        The trial court found, and I agree, that multiple passages in the summary were misleading to potential signers. The first misleading passage is the summary's opening clause, which prohibits insurers from discriminating based on preexisting conditions. Given that this prohibition appears first in the summary, the sponsors plainly deemed it a principal provision. But the term "insurers" is defined in the text of the initiative to include only insurers in the individual or group markets, which would exclude, as the sponsors' expert testified at trial, approximately 60 percent of individuals who are insured by employers' self-funded insurance plans. Because the summary refers generically to "insurers," voters would have no reason to know that the prohibition would not apply to most insurance policies. The sponsors could easily have avoided this serious misimpression by inserting the term "certain" before "insurers," or following the term "insurers" with the words "as defined in the Act," or language to similar effect. *See id.* at 20 ¶ 10 ("If necessary, a sponsor may refer potential signatories to the measure's text for more detail when explaining technical terms or difficult-to-grasp concepts."). Instead, typical petition signers would assume that if they have an insurer, they would be protected by the prohibition, although in most instances that assumption would be untrue. Yet this misleading language would inevitably provide powerful incentive for many voters to sign the petition.

¶34        The wording of this provision resembles another that led us to reject the first Invest in Education initiative in *Molera v. Reagan* (*Molera I*). That initiative's summary described a tax increase on wealthy taxpayers, but did not note that a change in tax indexing would affect many more taxpayers.   245 Ariz. 291, 297 ¶ 25 (2018).   The Court observed, "[a] description indicating that other people's taxes will be raised, but not the taxes of most of those signing the petition, creates a significant risk of confusion or unfairness and could certainly materially impact whether a person would sign the petition." *Id.* Here, most signers would consider themselves *included* in the protection against discrimination on the basis of preexisting conditions and could be induced to sign the petition on that basis, without realizing that many insured people will not be protected.

¶35        The second misleading provision is contained within this sentence: "Sets new minimum wages for direct care workers at private hospitals by requiring raises of at least five percent for each of four years." The term "direct care workers" is readily understood by a reasonable person to include, as the initiative defines it, "any nonmanagerial worker who is employed to . . . provide direct patient care."   The measure notes that it includes nurses, aides, and technicians.   Many would view doctors as direct care workers, but they are excluded.

¶36        This provision would likely have been an important selling point for prospective signatories.   When petitions were circulated, direct care workers were at the front lines of the COVID-19 pandemic, often risking their lives to help save others.   Providing a higher minimum wage and pay increases to direct care workers would likely attract great public support and, by extension, petition signatures.

¶37        Absent from this summary, however, is that the initiative also provides for pay increases for janitors, housekeepers, food service workers, and nonmanagerial administrative staff.   The initiative's text itself defines these occupations not as "direct care workers," but rather as employees that provide "services directly supporting direct care."   But the initiative nonetheless requires substantial pay increases not only for direct care workers, but for support staff and *most* hospital employees other than doctors and management.   The 100-word summary's emphasis on pay raises for direct care workers and omission of pay raises for other hospital workers contained within the initiative "obscure[s]" a principal provision's

"basic thrust." *Molera II*, 250 Ariz. at 20 ¶ 13. A reasonable voter, believing that front-line medical workers are uniquely deserving of a pay raise, might favor the former but not the latter, especially as broader pay raises might lead to higher hospital costs. The trial court was correct to conclude that the provision was "materially misleading."

**¶38** Again, the proponents could have easily made this provision unobjectionable by, for instance, adding "plus others" or "and support workers" to the term "direct care workers." Such clarity is necessary to "accurately communicate" the principal provisions' general objectives. *Id.* at 20 ¶ 10.

**¶39** In concluding that "the danger of confusion and voters being materially misled undermines any assurance that the voters received adequate notice of what they were signing," the trial court aptly cited Mark Twain, who observed that "the difference between the *almost right* word and the *right* word is really a large matter—'tis the difference between the lightning bug and the lightning." *The Wit and Wisdom of Mark Twain* (Bob Blaisdell ed., 1987). Indeed, the difference of a few words can separate an initiative summary that meets statutory standards of fair notice and accuracy from one that bears insufficient indicia that those who signed a petition were sufficiently informed of its contents. Given the central importance of initiatives in Arizona's system of popular sovereignty, I hope that the clarity provided by our recent decisions will minimize the need to remove proposed measures from the ballot.