IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

SETH LEIBSOHN, AN INDIVIDUAL;
CENTER FOR ARIZONA POLICY ACTION, A NONPROFIT CORPORATION;
ARIZONA FREE ENTERPRISE CLUB, A NONPROFIT CORPORATION;
GOLDWATER INSTITUTE FOR PUBLIC POLICY AND RESEARCH, A NONPROFIT
CORPORATION;
AND
AMERICANS FOR PROSPERITY, A NONPROFIT CORPORATION

*Plaintiffs/Appellants,*

*v.*

KATIE HOBBS,
IN HER CAPACITY AS THE
SECRETARY OF STATE OF ARIZONA,

*Defendant/Appellee,*

VOTERS' RIGHT TO KNOW,
A POLITICAL COMMITTEE,

*Real Party in Interest/Appellee.*

No. CV-22-0204-AP/EL
**Filed September 20, 2022**

Appeal from the Superior Court in Maricopa County
The Honorable Joseph P. Mikitish, Judge
No. CV2022-009709
**AFFIRMED**

COUNSEL:

Kory Langhofer, Thomas Basile, Statecraft PLLC, Phoenix, Attorneys for

Seth Leibsohn, Center for Arizona Policy Action, Arizona Free Enterprise Club, Goldwater Institute for Public Policy and Research and Americans for Prosperity

Joshua D. Bendor, Joshua J. Messer, Travis C. Hunt, Annabel Barraza, Osborn Maledon, P.A., Phoenix, and Spencer G. Scharff, Scharff P.C., Phoenix, Attorneys for Voters' Right to Know

Amy B. Chan, Noah T. Gabrielsen, Arizona Secretary of State's Office, Phoenix, Attorneys for Katie Hobbs

Timothy A. La Sota, Timothy A. La Sota, PLC, Phoenix, Attorney for Amicus Curiae Direct Contact, LLC

Dominic E. Draye, Greenberg Traurig, LLP, Phoenix, Attorneys for Amici Curiae Governor Doug Ducey, Senate President Karen Fann, and Speaker of the House Russell "Rusty" Bowers

---

VICE CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL and JUSTICES BOLICK, LOPEZ, BEENE, MONTGOMERY and KING joined.

---

VICE CHIEF JUSTICE TIMMER, Opinion of the Court:

¶1        Our state constitution grants the people of Arizona the right to propose and enact laws by initiative.   Ariz. Const. art. 4, pt. 1, § 1(1)–(2). Under Arizona's Voter Protection Act, enacted by initiative in 1998, the legislature cannot repeal or easily amend laws enacted by initiative, and the governor cannot veto them.   *Id.* § 1(6)(A)–(C).   The legislature retains its authority to reasonably regulate the initiative process, *see id.* § 1(14), but a regulating statute is permissible only if it "does not unreasonably hinder or restrict" the constitutionally granted right to the initiative process but instead "reasonably supplements" its purpose.   *Stanwitz v. Reagan*, 245 Ariz. 344, 348 ¶ 14 (2018) (quoting *Direct Sellers Ass'n v. McBrayer*, 109 Ariz. 3, 5 (1972)).   Exercising this authority and motivated by the impact of the Voter Protection Act, the legislature in 2017 enacted A.R.S. § 19-102.01(A), which requires proponents of statewide initiative measures to "strictly comply" with petition requirements and requires courts to

"strictly construe[]" those requirements. *See* 2017 Ariz. Sess. Laws ch. 151, § 3(A) (1st Reg. Sess.) (explaining the reasons for enacting the statute).

¶2 Before us is a challenge to the "Voters' Right to Know Act," also known as "Stop Dark Money," a proposed statewide initiative for the November 8, 2022 general election ballot. The issue here is whether signatures collected by some initiative petition circulators must be disqualified because those circulators failed to strictly comply with two statutory registration requirements. *See* A.R.S. § 19-118(B). We conclude that circulators failed to strictly comply with one statutory requirement. Ordinarily, this would require the Secretary of State to disqualify signatures gathered by these circulators. *See* § 19-118(A). But the registration process, which the Secretary alone is statutorily tasked with devising and implementing, prevented compliance with the statute. Under these circumstances, enforcing the statutory disqualification requirement would "unreasonably hinder or restrict" the constitutional right to engage in the initiative process. *Stanwitz*, 245 Ariz. at 348 ¶ 14 (quoting *Direct Sellers Ass'n*, 109 Ariz. at 5). We therefore decline to disqualify any signatures as a result of the circulators' failure to strictly comply with § 19-118(B).

¶3 We previously issued a decision order affirming the trial court's judgment rejecting objections based on this issue.[1] We now explain our reasoning in greater detail.

## BACKGROUND

¶4 The Voters' Right to Know Act initiative seeks to enact statutes eliminating "dark money" practices by requiring public disclosure of the original sources for certain campaign contributions made during an election cycle. In May 2021, the Secretary of State determined that the political action committee sponsoring the initiative (the "Committee") must gather 237,645 petition signatures by July 8, 2022, to place the initiative on the November 8, 2022 ballot.

¶5 The Committee used people serving as "circulators" to gather petition signatures. Paid and out-of-state petition circulators of statewide initiative measures, like the one here, must properly register with the

_____

[1] On the same day, we similarly refused to disqualify signatures on the identical basis concerning challenges to two other initiatives, the Predatory Debt Collection Protection Act and the Arizona Election and Voting Policies initiatives. Separate opinions further explaining the decisions concerning these proposed initiatives are forthcoming.

Secretary of State before circulating petitions or the Secretary will disqualify all signatures collected by that circulator. § 19-118(A). Among other things, the registration application must include the circulator's "residence address" and a notarized affidavit avowing both the person's eligibility to be a circulator and the accuracy of all registration information provided. § 19-118(B).

¶6 On July 7, 2022, one day before the deadline, the Committee filed petition sheets with the Secretary containing 393,490 signatures. The Secretary reviewed the sheets for statutory compliance pursuant to A.R.S. § 19-121.01(A) and determined that 355,726 signatures were eligible for verification. The Secretary then randomly selected a 5% sample (17,787 signatures) for signature verification by county recorders in the counties where signatories in the sample claimed to be qualified electors. *See* § 19-121.01(B). The outcome of that process would produce a validity rate that the Secretary then could apply to the 355,726 eligible signatures. *See id.*; § 19-121.04(A)(3). A validity rate of at least 66.81% was required to result in a sufficient number of valid signatures to qualify the initiative for the ballot.

¶7 On July 29, before completion of the signature verification process, Appellants ("Challengers") filed this lawsuit challenging the legal sufficiency of certain circulator registrations. Challengers sought to disqualify the signatures gathered by those circulators and enjoin placement of the initiative on the ballot for lacking a sufficient number of supporting signatures. *See* § 19-118(F) (authorizing challenges to circulator registration); A.R.S. § 19-122(C) (authorizing broader challenges to an initiative). After holding an evidentiary hearing, the trial court denied most of Challengers' objections and entered an interlocutory judgment pursuant to Arizona Rule of Civil Procedure 54(b), which permitted this expedited appeal.

¶8 The issues here are (1) whether circulators who live in multi-unit housing must list a unit number in the "residence address" required for the registration application, and (2) whether they must submit a new affidavit for each petition they intend to circulate.

## DISCUSSION

### I. Listing a Unit Number in a "Residence Address"

**¶9**     Challengers argue that § 19-118(B)(1) requires a circulator living in multi-unit housing to state a unit number as part of the "residence address" listed on the registration application.   Because the Committee did not "strictly comply" with this requirement when registering circulators, *see* § 19-102.01(A), Challengers argue the trial court erred by refusing to disqualify the signatures gathered by the affected circulators. The Committee responds that § 19-118(B)(1) does not explicitly require a unit number, and the trial court therefore properly refused to add that requirement.

**¶10**     We review the interpretation of § 19-118(B)(1) de novo.   *See Leach v. Reagan*, 245 Ariz. 430, 438 ¶ 33 (2018).   If the statute has only one reasonable meaning when considered in context, we apply that meaning without further analysis.   *Id.*; *see also S. Point Energy Ctr. LLC v. Ariz. Dep't of Revenue*, 253 Ariz. 30, 34 ¶ 14 (2022).   If the statute has more than one reasonable meaning, we apply secondary interpretive principles, including considering the statute's subject matter and purpose, to identify legislative intent.   *S. Point Energy Ctr. LLC*, 253 Ariz. at 34 ¶ 14.

**¶11**     Section 19-118(B)(1) requires a circulator registration application to contain "[t]he circulator's full name, residence address, telephone number and email address."[2]   The legislature neither defined "residence address" nor specified the need for a unit number.   Strictly construing the term, as we must, *see* § 19-102.01(A), we conclude a unit number is not required as part of a "residence address."

**¶12**     The plain meaning of "residence" is "the place where one actually lives."   *Residence*, Merriam Webster, https://www.merriam-webster.com/dictionary/residence (last visited Sept. 15, 2022).   And "address" plainly means "a place where a person or organization may be communicated with."   *Address*, Merriam Webster, https://www.merriam-webster.com/dictionary/address (last visited Sept. 15, 2022).   The "residence address" therefore requires sufficient information to describe where a circulator lives and can be found to communicate with.   A street name and number for a structure within an adequately described area (e.g., a city, township, or zip code) sufficiently identifies a residence address because it describes where a circulator lives and can be found.   The legislature did not require a more complete address, which could include a unit number.   *See* A.R.S. § 16-152(A)(3) (requiring voter registration to include "[t]he complete address of the registrant's actual place of residence, including street name and number,

---

[2] See *infra* ¶ 19 for § 19-118(B)'s complete text.

apartment or space number"); *see also* A.R.S. § 12-991(I) (requiring a notice that property is considered a nuisance due to alleged criminal activity thereon to include an "address *and* unit number if applicable" (emphasis added)).

¶13    Notably, § 19-118(B)(1) does not require a "mailing address," which would necessitate a unit number to direct and ensure delivery of mail to people in multi-unit housing.    *See Ruiz v. Lopez*, 225 Ariz. 217, 221 ¶ 14 (App. 2010) (noting that the United States Postal Service considers a complete address as including, when applicable, a unit number).    In contrast, § 19-118(B)(4) requires a sponsoring committee's address for purposes of serving a subpoena on the circulator by "certified mail to the address provided."    Nothing in subsection (B)(1) evidences the legislature's intent that a "residence address" must be described in sufficient detail to permit mail delivery, which would require a unit number if the circulator lived in multi-unit housing.

¶14    Other election statutes, as emphasized hereafter, demonstrate the legislature's understanding that "residence address" is distinct from "mailing address."    *See* § 16-152(A)(4) (requiring a registering voter to list a "complete mailing address, *if different from the residence address*" (emphasis added)); A.R.S. § 16-168(C)(5) (requiring precinct lists delivered to party chairmen to include each elector's "[m]ailing address, *if different from residence address*" (emphasis added)); A.R.S. § 16-311(A)–(B) (requiring candidates to file nomination papers giving "the person's actual residence address" *or*, when no residence address is available, a "post office address"); A.R.S. § 16-544(B) (providing that an early voter application must allow voters to give a "residence address [*and*] mailing address in the voter's county of residence "); A.R.S. § 16-351(F) (accounting for the fact that an elector may sign a nominating petition using a "residence address" *or* a "mailing address"); *see also* A.R.S. § 36-2804.02(A)(3)(a) (requiring qualifying patients for medical marijuana to register by listing a "mailing address [*and*] residence address").    In short, the legislature knows how to specify when an address requires a unit number, and it did not do so in § 19-118(B)(1).

¶15    A unit number is also not required to fulfill the legislature's intent that circulators "be available for court proceedings if the signatures they gather are challenged."    *Leach v. Hobbs*, 250 Ariz. 572, 576 ¶ 19 (2021). Instead of designating a circulator's "residence address," which might be outside Arizona, as the place for serving process on a circulator, the legislature requires a circulator to "accept service of process related to disputes concerning circulation of that circulator's petitions" at the

sponsoring committee's in-state address. § 19-118(B)(4). Service can be made "by mailing a copy of the subpoena to the committee by certified mail," or by leaving a copy "with a person of suitable age" at the committee's address. *Id.*

**¶16** A subpoena can still be served on a circulator personally. *Id.* But in the unlikely event petition challengers choose the more cumbersome path of serving all circulators at their residences rather than simply mailing copies of all subpoenas to a single committee address, a unit number is unnecessary for effectuating service. Nothing in this record suggests process cannot be served on a circulator at a listed multi-unit building absent a unit number, particularly as a process server can easily contact the circulator using the circulator's listed telephone number and email address to ask for a more precise location. *See* § 19-118(B)(1). Regardless, the legislature's designation of a committee's address as the service-of-process address demonstrates it did not intend the "residence address" to fulfill that purpose.

**¶17** In sum, § 19-118(B)(1) does not require that a "residence address" include a unit number if the circulator lives in multi-unit housing. The trial court did not err by rejecting Challengers' argument to the contrary.

## II. The Need for Multiple Circulator Affidavits

**¶18** Challengers argue the trial court misinterpreted and misapplied § 19-118(B)(5)'s circulator affidavit requirement by finding that a new affidavit is not required when registering to circulate an initiative petition if the circulator had previously filed an affidavit concerning a different initiative measure. The Committee responds that because the legislature required only that "an affidavit" be included in the application, one affidavit for multiple initiative measures complies with subsection (B)(5). It points out that the Secretary interpreted subsection (B)(5) this way by not allowing circulators to electronically file separate affidavits for each petition they intended to circulate.

**¶19** We interpret subsection (B)(5) in context. *See Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019). Section 19-118(A) obligates the committee sponsoring an initiative measure to "collect and submit the completed [circulator] registration applications" to the Secretary. Subsection (B) specifies the application content:

> **B.** The circulator registration application required by subsection A of this section shall require the following:

1. The circulator's full name, residence address, telephone number and email address.

2. The initiative or referendum petition on which the circulator will gather signatures.

3. A statement that the circulator consents to the jurisdiction of the courts of this state in resolving any disputes concerning the circulation of petitions by that circulator.

4. The address of the committee in this state for which the circulator is gathering signatures and at which the circulator will accept service of process related to disputes concerning circulation of that circulator's petitions. Service of process is effected under this section by delivering a copy of the subpoena to that person individually, by leaving a copy of the subpoena with a person of suitable age or by mailing a copy of the subpoena to the committee by certified mail to the address provided.

5. An affidavit from the registered circulator that is signed by the circulator before a notary public and that includes the following declaration:

I, (print name), under penalty of a class 1 misdemeanor, acknowledge that I am eligible to register as a circulator in the state of Arizona, that all of the information provided is correct to the best of my knowledge and that I have read and understand Arizona election laws applicable to the collection of signatures for a statewide initiative or referendum.

Within five business days after submission and review of a compliant application, the Secretary must "register and assign a circulator registration number to the circulator." § 19-118(C).

¶20 Construing subsection (B)(5) through the lens of the entire application process, we conclude that a new circulator affidavit is plainly required for each initiative petition a circulator wishes to circulate. First, subsection (A) requires the sponsoring committee, not individual circulators, to submit circulator registration applications. Although subsection (A) does not preclude a committee from delegating that responsibility to circulators, obligating committees with the task evidences the legislature's intent that separate applications be submitted for each initiative measure, including separate affidavits.

**¶21** Second, the affidavit accompanying the application must declare that the circulator is "eligible to register" and "that all of the information provided is correct." § 19-118(B)(5). But the eligibility of a circulator can change from one application to the next, making it impossible to attest to future eligibility. Also, because application information includes the identity of "[t]he initiative or referendum petition on which the circulator will gather signatures," § 19-118(B)(2), and the sponsoring committee's address where the circulator agrees to accept service of process, § 19-118(B)(4), that information will change each time a committee (or a circulator) submits an application for a different initiative measure. Thus, because an affidavit attesting to the accuracy of the information in an application is unique to that application, the affidavit cannot apply to future applications.

**¶22** We are not persuaded to reach a different interpretation of § 19-118(B)(5) simply because the Secretary may construe the requirement differently. Subsection (A) requires the Secretary to include in the Elections Procedures Manual ("EPM") required by A.R.S. § 16-452(B) "a procedure for registering circulators, including circulator registration applications." § 19-118(A). The EPM must be "approved by the governor and the attorney general" before issuance, § 16-452(B), and once issued, generally has the "force of law," *see, e.g., Ariz. Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 63 ¶ 16 (2020). But an EPM regulation that contradicts statutory requirements does not have the force of law. *Hobbs*, 250 Ariz. at 576 ¶ 21. Further, it is this Court's role, not the Secretary's, to interpret § 19-118(B)(5)'s meaning. *See State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 595 ¶ 25 (2017) (noting this Court is "authorized and obligated . . . to say what the law is" (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803))).

**¶23** In sum, § 19-118(A) requires a sponsoring committee for each proposed initiative measure to file circulator registration applications with the Secretary. A committee can delegate that responsibility to circulators but remains ultimately responsible for any errors. An application must satisfy five requirements pursuant to § 19-118(B), including submission of a sworn affidavit from the circulator. An application concerning one proposed initiative measure cannot rely on an affidavit submitted as part of an application concerning a different proposed initiative measure. The Committee violated § 19-118(B)(5) to the extent it failed to submit a new circulator affidavit with each application pertaining to the Voters' Right to Know Act initiative.

### III. Consequences For Not Complying With § 19-118(B)(5)

**¶24** Section 19-118(A) provides that the Secretary "shall disqualify all signatures collected by a circulator who fails to [properly] register." But the Committee asserts the Secretary's registration procedures made it impossible to strictly comply with § 19-118(B)(5). We agree.

**¶25** The Committee was required to follow the 2019 EPM established by the Secretary and approved by the governor and the attorney general.[3] *See* § 16-452(B); § 19-118(A). It provides that "[c]irculator registration must be conducted as prescribed by the Secretary of State through the electronic Circulator Portal." Ariz. Sec'y of State, 2019 Election Procedures Manual 252 (2019), https://azsos.gov/sites/default/files/2019_ELECTIONS_PROCEDURES _MANUAL_APPROVED.pdf. According to a declaration from Kori Lorick, the Secretary's elections director, the electronic portal is the exclusive means for submitting a circulator registration, and the Secretary's office will not accept paper filings.

**¶26** The Secretary's electronic registration process is directed at circulators.[4] It requires a circulator to create a portal account by providing identifying and contact information and creating a password. After the circulator verifies the accuracy of the circulator's email address, the portal automatically sends an email assigning a circulator identification number and providing links to complete the registration. The system permanently assigns the identification number to the circulator and must be used for all petitions circulated by that person, regardless of the petition subject or the election cycle.

**¶27** To complete the registration, the circulator must upload a notarized affidavit in the form required by § 19-118(B)(5). *See supra* ¶ 19. After the affidavit is uploaded, a staff member reviews it and, assuming the

---

[3] Although § 16-452(B) required the Secretary to issue a new EPM no later than December 31, 2021, the attorney general and the governor did not timely approve an updated EPM, leaving the 2019 EPM in effect throughout the time the Committee gathered signatures.

[4] Notably, § 19-118(A) requires a sponsoring committee to submit circulator registration applications. Although nothing prevents a committee from delegating this responsibility to circulators, the registration process should nevertheless permit committees to file the applications, as § 19-118(A) contemplates. Indeed, committees might choose to do so to ensure that applications comply with § 19-118(B) before their submission.

affidavit is compliant, emails notice to the circulator confirming its acceptance. At that point, the Secretary considers the circulator "initially registered." To begin lawfully collecting signatures, however, the circulator must log into the account and use a link to identify the initiative measures for which the circulator intends to gather signatures.

¶28 Significantly, according to Lorick, "[t]he system only requires circulators to upload an affidavit at initial registration and *does not allow* circulators to upload a separate affidavit for each petition they add to their registration." (Emphasis added.) Thus, "it is not uncommon for registered circulators to have a notarized affidavit of eligibility on file in the Circulator Portal that is dated earlier, and, in some cases, many months earlier, than the date the circulator added specific petitions to their registration." As previously explained, § 19-118(B) requires a new circulator affidavit for each initiative petition a circulator wishes to circulate. *See supra* ¶¶ 20–23. The Secretary's treatment of circulator affidavits is incorrect and, combined with the fact that the Secretary does not accept paper affidavits, prevents compliance with § 19-118(B).

¶29 Applying § 19-118(A) to disqualify signatures under these circumstances would "unreasonably hinder or restrict" the Committee's (and the people's) constitutionally guaranteed right to engage in the initiative process. *See* Ariz. Const. art. 4, pt. 1, § 1(1)–(2), (14); *Stanwitz*, 245 Ariz. at 348 ¶ 14. The Committee did not merely rely on bad advice by the Secretary's office, which would not have excused the Committee's noncompliance. *See W. Devcor, Inc. v. City of Scottsdale*, 168 Ariz. 426, 431 (1991) ("[The defendant] cannot rely on the Secretary of State's sample form any more than they can rely on a statute that conflicts with the constitution. Although [the defendant's] 'Catch 22' argument may help explain how the constitutional defect occurred, it does not cure it."). The Committee was required to use the Secretary's electronic portal process and had no ability to bypass it by filing a circulator affidavit specific to the Voters' Right to Know Act initiative if a circulator already had an affidavit "on file." Nor could the Committee submit a paper affidavit, because the Secretary would not accept it. As amicus Direct Contact, LLC, a petition-gathering firm, put it, "[o]nce it became clear that there was no ability to upload these [subsequent affidavits] on the Secretary of State's portal," it could only ask circulators to add new petitions to their accounts.

¶30 Challengers assert we should not excuse the Committee's noncompliance with § 19-118(B)(5) because it could have submitted new affidavits by mail or email, even if the Secretary would have rejected them,

or sought a court order forcing acceptance. This is a bar too high. The legislature required the Committee to follow the Secretary's procedures, *see* § 19-118(A), and the Committee did so. Disqualifying signatures for adhering to the Secretary's registration requirements would be tantamount to blessing a trap laid for unwary sponsoring committees.[5]

**¶31** Challengers nevertheless argue we should at least disqualify signatures gathered by circulators who had registered with the Secretary before September 29, 2021 and were able to upload a second affidavit after that date. We disagree. The Secretary permitted circulators to register a new affidavit after September 29, 2021, because that was the effective date of new legislation, 2021 Ariz. Sess. Laws ch. 319, § 8 (1st Reg. Sess.), that extended the affidavit requirement to paid and out-of-state circulators of recall petitions. But the Voters' Right to Know Act initiative is not a recall effort, and the Committee would have had no reason to compel its circulators to upload affidavits for that purpose. Also, because the Secretary allowed only one affidavit for these circulators after September 29, 2021, we would have to speculate that any new affidavit would have applied to the Committee's initiative and not the Predatory Debt Collection Protection Act initiative, the Arizona Election and Voting Policies initiative, or any others which were also circulating.

**¶32** In sum, the Secretary made it impossible for the Committee to comply with § 19-118(B)(5) regarding circulators who had previously registered and uploaded affidavits concerning other initiative petitions. Consequently, although some of the Committee's circulators did not strictly comply with § 19-118(B)(5), we conclude § 19-118(A) is unconstitutional as applied in the specific circumstances here and cannot be invoked to disqualify signatures. *See* Ariz. Const. art. 4, pt. 1, § 1(1)–(2). We therefore agree with the trial court's refusal to disqualify signatures for noncompliance with § 19-118(B)(5), albeit for different reasons.[6]

---

[5] We presume the Secretary will change the circulation registration process to permit compliance with § 19-118(B)(5). Until then, sponsoring committees are on notice to seek court intervention if the Secretary refuses to accept affidavits in the manner required by that statute.

[6] After our disposition of this appeal in the decision order, the county recorders completed the signature verification process, and the trial court found that the Committee had gathered a sufficient number of signatures to qualify the Voters' Right to Know Act initiative for the ballot. Challengers did not appeal that judgment.

### IV. Attorney Fees

**¶33** Both parties request an award of attorney fees pursuant to § 19-118(F), which provides that the prevailing party in an action like this one is entitled to reasonable fees. Here, neither party prevailed entirely in their arguments concerning the Committee's compliance with § 19-118(B). Our refusal to disqualify signatures for the Committee's failure to comply with § 19-118(B)(5) was based on the Secretary's acts rather than the Committee's legal arguments here. We therefore decline each party's request for attorney fees.

### CONCLUSION

**¶34** For the foregoing reasons, we affirm the trial court's judgment and decline to award attorney fees to either party.