IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**SCOT MUSSI, ET AL.,**
*Plaintiffs/Appellants/Cross-Appellees*,

*v.*

**KATIE HOBBS, IN HER CAPACITY AS THE SECRETARY OF STATE OF ARIZONA,**
*Defendant/Appellee*,

**ARIZONANS FOR FREE AND FAIR ELECTIONS (ADRC ACTION), A POLITICAL COMMITTEE,**
*Real Party in Interest/Appellant.*

---

No. CV-22-0207-AP/EL
Filed July 24, 2023

---

Appeal from the Superior Court in Maricopa County
The Honorable Joseph P. Mikitish, Judge
No. CV2022-009391
**AFFIRMED**

---

COUNSEL:

Kory Langhofer, Thomas J. Basile, Statecraft PLLC, Phoenix, Attorneys for Scot Mussi, Aimee Yentes, and Arizona Free Enterprise Club

Amy B. Chan, Noah Gabrielsen, Arizona Secretary of State's Office, Phoenix, Attorneys for Katie Hobbs

James E. Barton, II, Jacqueline Mendez Soto, Barton Mendez Soto PLLC, Tempe; and Joshua J. Messer, Travis C. Hunt, Osborn Maledon, P.A., Phoenix, Attorneys for Arizonans for Free and Fair Elections (ADRC Action)

Danielle Marie Lang, Campaign Legal Center, Washington, DC; and Roy Herrera, Daniel A. Arellano, Herrera Arellano LLP, Phoenix, Attorneys for Amicus Curiae Campaign Legal Center

Dominic E. Draye, Greenberg Traurig LLP, Phoenix, Attorneys for Amici Curiae Governor Doug Ducey, Senate President Karen Fann, and Speaker of the House Russell "Rusty" Bowers

Michael Bailey, Arizona Chamber of Commerce and Industry, Phoenix, Attorney for Amicus Curiae Arizona Chamber of Commerce and Industry

———————————

JUSTICE MONTGOMERY authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, and JUSTICES LOPEZ, BEENE, and KING joined.   VICE CHIEF JUSTICE TIMMER authored an Opinion in which she concurred in part, dissented in part, and dissented in the result.[*]

———————————

JUSTICE MONTGOMERY, Opinion of the Court:

¶1         This case concerns multiple expedited election appeals and cross-appeals regarding the interpretation and application of the statutes governing initiative petitions and the method for determining whether an initiative has sufficient valid signatures to qualify for placement on the ballot.   We previously issued orders affirming in part and reversing in part trial court rulings, remanded for further determinations, and ultimately affirmed the trial court's amended final judgment finding that the challenged initiative failed to qualify for the ballot.   This Opinion sets forth our reasoning for those orders.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

¶2         On February 7, 2022, Arizonans for Free and Fair Elections (ADRC Action) (the "Committee") filed an application for a serial number to circulate petitions for an initiative entitled the "Arizona Fair Elections Act" (the "Act").   The Act addressed voting rights, campaign finance, citizen-initiated measures, and lobbyist regulation.   On July 7, 2022, the Committee submitted about 52,000 petition sheets with an estimated 475,290 signatures to the Secretary of State's Office (the "Secretary").   The Committee needed at least 237,645 valid signatures to qualify the Act for

---

[*] Justice Clint Bolick did not participate in the consideration of this matter.

the November 8, 2022, General Election ballot.[1]

¶3 On July 22, 2022, Scot Mussi, Aimee Yentes, and the Arizona Free Enterprise Club (collectively "Plaintiffs") filed a complaint challenging the legal sufficiency of certain circulator registrations and the initiative petition as a whole. Challenges pursuant to A.R.S. § 19-118 encompassed allegations that circulators either failed to properly register prior to circulating petitions or failed to provide required information on registration applications. Plaintiffs also claimed that nearly 80% of the signatures submitted by the Committee were invalid due to non-compliance with chapter 1, title 19, pursuant to A.R.S. § 19-122(C).

¶4 The Secretary notified the Committee by letter dated July 31, 2022, that 399,838 signatures were eligible for random sampling and verification by county recorders following her initial review of the petitions and signatures as required by A.R.S. § 19-121.01(A). The county recorder review had to be completed no later than August 22, 2022. *See* A.R.S. § 19–121.02.

¶5 From August 9 to August 13, a Special Master appointed by the trial court held a series of hearings with the parties, reviewing 354 exhibits and Plaintiffs' thirty-two objections, with subparts. Afterwards, the Special Master submitted a report to the trial court that included findings of fact and conclusions of law, stipulations of the parties to the validity and invalidity of signatures in various objections, the reservation of some objections for trial, and noting that Plaintiffs withdrew two objections. The court thereafter conducted an evidentiary hearing on August 15 and 16 and entered an interlocutory judgment on August 18, pursuant to Arizona Rule of Civil Procedure 54(b). The judgment adopted the report of the Special Master, granted Plaintiffs' objections in part and denied others, and left the record open until after the county recorders' review to address voter registration objections. Accordingly, the court did not then decide whether the Act had enough signatures to qualify for the

---

[1] The number of required valid signatures for a statewide initiative is 10% percent of the number of votes cast for all candidates for governor at the last preceding general election. Ariz. Const. art. IV, pt. 1, § 1(2), (7).

ballot.

¶6     The parties sought expedited review of the trial court's judgment. In our August 22 decision order, we affirmed the court's interlocutory judgment in part, reversed in part, remanded with instructions, and stated that an opinion would follow.

¶7     On August 25, the trial court entered a final judgment, finding that the initiative had 239,926 valid signatures, more than the 237,645 required to qualify for the ballot, and ordered the Secretary to "not rescind her previously issued determination that the measure is qualified for the November 2022 General Election Ballot." Plaintiffs appealed, contesting the calculation of valid signatures. However, upon review of the trial court's judgment, we were unable to determine how the court calculated the final number of valid signatures. This hindered our review of Plaintiffs' appeal. Therefore, we issued a supplemental decision order remanding the matter to the trial court with instructions to amend its judgment by detailing the particular calculations used to reach its determination. We did not conclude or comment as to whether the court's ultimate finding was in error.

¶8     After receiving the parties' additional briefing on the method for determining the number of valid signatures, the trial court entered an amended final judgment, which set forth its calculations in detail. Unlike its prior ruling, the court found that the initiative had an insufficient number of valid signatures, 236,187, and ordered the Secretary to rescind the determination that the initiative qualified for the ballot. The Committee appealed and by decision order we affirmed the trial court's ruling and stated that an opinion would follow.

¶9     To facilitate setting forth the reasoning in our previous orders affirming in part and reversing in part the trial court's Rule 54(b) judgment and affirming its amended final judgment, we consolidated the various matters in this Opinion. We have jurisdiction under article 6, section 5 of the Arizona Constitution and A.R.S. §§ 19-118, -122(C).

4

## II. DISCUSSION

**A. First Appeal**

¶10    Plaintiffs and the Committee challenged several of the trial court's rulings in the August 18 interlocutory judgment concerning the validity of petitions based on whether certain circulators were properly registered.   The Committee noted that its cross-appeal was "limited to reviewing objections on which the trial court ruled that will ultimately impact the calculation for the initiative's ballot qualification."   However, in a footnote, the Committee stated:

> The trial court also did not rule that sufficient signatures were disqualified to prevent the Secretary from certifying the measure for the ballot. Indeed, although not before the Court at this time, there have not been 162,213 signatures, in addition to those removed by the Secretary, disqualified by the trial court at this time, nor would there be even if the Court reversed on all issues raised by Petitioners.

¶11    Consequently, we issued an order on August 22 directing the parties to provide a joint statement explaining, no later than 2:00 p.m. the next day:

> (1) the status or result of the county certifications under A.R.S. § 19-121.02 and whether that affects the eligibility of the initiative; (2) the effect, if any, of the Court's consideration of the various matters in this case on the eligibility of the initiative; and attaching (3) a short declaration from the office of the appropriate election director advising of the latest date by which this Court needs to decide this appeal.

¶12    The parties responded that "the margin of victory or loss in this matter is unusually narrow" and that they did not appeal portions of the trial court's ruling that were "unlikely to be outcome determinative," though they asserted that the issues before the Court "may be material." The parties assured the Court that "[i]f outside events (e.g., litigation

concerning county recorder certifications) causes [sic] any of the issues pending in this appeal to become mathematically immaterial to the measure's qualification for the statewide ballot, the parties will promptly notify this Court of the issue's mootness." The State Elections Director provided a declaration that Maricopa County had the earliest deadline for ballot printing of August 25, 2022.

¶13 The resolution of the issues presented by the parties "involves interpretation and application of constitutional and statutory provisions regarding initiatives, which we review de novo." *Molera v. Reagan*, 245 Ariz. 291, 294 ¶ 8 (2018). "Where unambiguous, we apply the express terms of a constitutional or statutory provision without resorting to secondary methods of construction." *Arizonans for Second Chances, Rehab., & Pub. Safety v. Hobbs*, 249 Ariz. 396, 406, ¶ 28 (2020). Further, we give meaning to "[e]ach word, phrase, clause, and sentence . . . so that no part will be void, inert, redundant, or trivial." *City of Phoenix. v. Yates*, 69 Ariz. 68, 72 (1949).

### 1. Plaintiffs' issues

¶14 Plaintiffs presented three issues concerning circulators. First, Plaintiffs argued that an affidavit previously submitted to register for a different petition does not meet the affidavit requirement for a registration application for the Act pursuant to § 19-118(B). In our decision order, we disagreed with the trial court's conclusion that a circulator affidavit is not required for *each* circulated petition. We nevertheless declined to invalidate petition sheets due to the failure of circulators to comply with § 19-118(B)(5) for the reasons explained in *Leibsohn v. Hobbs*, 254 Ariz. 1 (2022), which addressed the identical issue. *Id.* at 6–9 ¶¶ 18–32 (2022) (explaining that the only means provided by the Secretary for circulators to register made compliance with § 19-118(B)(5) impossible and therefore concluding that the statute "cannot be invoked to disqualify signatures").

¶15 Second, Plaintiffs argued that a circulator who resides in a multi-unit structure must include a unit number as part of a "residence address" to comply with required registration information. § 19-118(B)(1) (providing that "[t]he circulator registration application . . . shall

require . . . [t]he circulator's full name, residence address, telephone number and email address"). We declined to disqualify petition sheets based on an alleged failure to provide a unit number as part of a residential address and affirmed the trial court's ruling for the reasons also stated in *Leibsohn*. 254 Ariz. at 3–6 ¶¶ 9–17 (reviewing the provisions of § 19-118(B)(1) and concluding that it "does not require that a 'residence address' include a unit number if the circulator lives in multi-unit housing").

¶16 Last, Plaintiffs argued that a circulator who failed to include in the registration application a suite number in a multi-unit commercial building address did not provide the requisite information for service of process as required by § 19-118(B)(4). The statute reads:

> The address of the committee in this state for which the circulator is gathering signatures and at which the circulator will accept service of process related to disputes concerning circulation of that circulator's petitions. Service of process is effected under this section by delivering a copy of the subpoena to that person individually, by leaving a copy of the subpoena with a person of suitable age *or* by mailing a copy of the subpoena to the committee by certified mail to the address provided.

§ 19-118(B)(4) (emphasis added). To effect service of process by certified mail, detailed address information is required. *See* United States Postal Service Form 3800 (requiring an apartment number or a PO Box number for certified mail). Much like multi-family housing identifies individual apartments with a unit number, a multi-office complex also identifies individual offices by a unit or suite number. Thus, to effect service of process via *certified mail*, which secures a signature from the recipient at the named address for proof of delivery, a complete committee mailing address must include a unit or suite number, if applicable. *Id.*; *see also What Is Certified Mail?*, USPS.COM (May 26, 2021), https://faq.usps.com/s/article/What-is-Certified-Mail. We therefore reversed the trial court's finding and remanded with directions to invalidate the affected petitions.

2. Committee's issues

**¶17**　　　　The Committee cross-appealed on five circulator-related issues.[2]　First, the Committee argued that petition sheets should not be removed on the basis of a circulator's registration application and the court should conduct no further inquiry when the application was accepted by the Secretary.　"[T]he only circulators whose petitions may be removed for not being 'properly registered' are those who actually fail to register when they were required to do so.　The Legislature has not authorized this Court or the Secretary to remove petition signatures for anything less."

**¶18**　　　　Section 19-118(F) provides that "[a]ny person may challenge the lawful registration of circulators."　A "lawful" registration is one which complies with the requirements for circulator registration.　*Lawful*, Black's Law Dictionary (11th ed. 2019) ("Not contrary to law . . . .").　The information required for registration is set forth at § 19-118(B), and § 19-118(D) lists circumstances that preclude a circulator from registering at all.

**¶19**　　　　The Committee's argument, premised on mere registration, would read "lawful" out of the statute and preclude any basis for challenging a circulator's failure to comply with the registration requirements set forth at § 19-118.　We decline to read the statute in this manner.　*Yates*, 69 Ariz. at 72 (interpreting statutes "so that no part will be void, inert, redundant, or trivial"); *see also Fann v. State*, 251 Ariz. 425, 434 ¶ 25 (2021) ("We also avoid interpreting a statute in a way that renders portions superfluous.").　Thus, the fact that the Secretary accepted a circulator's registration application does not foreclose future challenges to whether that circulator properly registered.

---

[2] The Committee also raised the issue of whether the proper standard for determining challenges to the Act was strict, versus substantial, compliance.　However, the Committee explained that "the Court need not reach this question because under a properly construed strict compliance standard, Petitioners' claims fail."　We therefore do not address this issue.

**¶20** Second, the Committee argued that using a nonresidential address as a temporary address should not invalidate a registration application. In particular, the Committee noted that § 19-118 does not require a temporary address, though the Secretary's form contained an optional line where a circulator "*may* provide a temporary address." (Emphasis added.) The Committee is correct. Section 19-118(B) does not require a temporary address. There is, therefore, no requirement to provide any particular temporary address, residential or otherwise. Accordingly, we reversed the trial court's ruling and remanded for the trial court to rehabilitate petition sheets disqualified on this basis.

**¶21** Third, the Committee argued that an incorrect phone number on a registration form should not invalidate a registration application because there is no prohibition against changing telephone numbers. Yet, in its August 22 judgment, the trial court observed:

> In closing arguments, the parties noted that, in the absence of a notarized affidavit and/or declaration in support of the accuracy of the phone number and email address on the circulator's affidavit filed with the Secretary of State, the Parties stipulate to the contact information as inaccurate at the time the affidavit was filed.

Accordingly, we remanded this issue for the trial court to determine whether petition sheets invalidated due to incorrect phone numbers were addressed by the parties' stipulation.

**¶22** Fourth, the Committee argued that petitions should not be invalidated because a circulator's address on a petition sheet does not match the address on the registration application given that "there is no statutory requirement that a circulator maintain only one residence address throughout the election cycle" and that "there is no requirement that a circulator's residence address on their circulator registration form must match that on the petition sheets." However, the trial court again observed that the parties had stipulated "that of those circulators that listed differing address[es], some could not be confirmed as having moved during the relevant time frame." The court thus "conclude[d] that it must

invalidate any petition sheets on which the circulator provided a different residential address tha[n] was provided on his or her registration form, and for which the parties do not stipulate that the circulator moved during the relevant time frame." Although we agreed that there is no statutory requirement that the address on the circulator's affidavit must be the same as the address in the registration application, we remanded to the trial court to effectuate the parties' stipulation where differing addresses due to a change in residence could not be confirmed.

¶23 Fifth, the Committee argued that signatures should not be invalidated on the basis that the circulator used an address for service of process which was not the Committee's address. The trial court concluded that "[b]ecause state law requires the Committee's address on the registration form, . . . the circulator's petitions must be stricken." Pursuant to § 19-118(B)(4), the circulator is clearly required to list "[t]he address of the committee in this state for which the circulator is gathering signatures *and* at which the circulator will accept service of process related to disputes concerning circulation of that circulator's petitions." (Emphasis added.) Therefore, we affirmed the trial court's ruling.

¶24 Finally, given our resolution of the issues and remand to the trial court, we determined that there was no "prevailing party" and denied the parties' requests for attorney fees pursuant to § 19-118(F) and stated that a written opinion would follow.

**B. Second Appeal**

¶25 The trial court entered a final judgment on August 25, finding that the initiative had sufficient valid signatures to qualify for the ballot, 239,926. Plaintiffs appealed, contesting the calculation of valid signatures and we ordered simultaneous supplemental briefing from the parties. However, the trial court's final judgment lacked the necessary detail for us to discern how the trial court calculated the number of valid signatures. Thus, we could not adequately address Plaintiffs' argument on appeal. We remanded in a supplemental decision order, stating:

> The Court is unable to verify the invalidity rate used by the
> trial court under A.R.S. § 19-121.04 or the calculations based

on that statute. Therefore, IT IS ORDERED remanding the matter to the trial court to enter an amended judgment showing the basis for each of its calculations, and their statutory basis under A.R.S. § 19-121.04, including (1) the specific source of its numerical findings; (2) the invalidity rate; (3) the specific calculations used to determine the invalidity rate; and (4) the number of signatures successfully challenged that were also determined to be invalid by the county recorders. The amended judgment is to be entered no later than 11:00 a.m. on Friday August 26, 2022.

## C. Final Appeal

### 1. Trial court calculations

¶26 The trial court issued its amended final judgment on August 26, finding 236,187 valid signatures, which was fewer than the 237,645 required to qualify for the ballot.

¶27 Beginning with an initial total number of 399,858 eligible signatures,[3] the court subtracted the number of signatures the parties stipulated as adjudicated invalid—96,237. This left 303,621 signatures.

¶28 The court then considered the number of valid and invalid signatures as determined by county recorders—15,140 valid and 4,852 invalid. Because there was an overlap of 412 invalid signatures between the county recorder review and Plaintiffs' challenge, the court "restored" these 412 signatures to the number of valid signatures in the random sample, resulting in 15,552 valid signatures, 4,440 invalid, and a "validity rate" of 77.79% (15,552/19,992). Applying this validity rate to the 303,621 signatures (.7779 $x$ 303,621), the court determined that the Committee had only 236,187 valid signatures and enjoined the measure from appearing on the ballot. The Committee appealed.

---

[3] The Secretary actually reported 399,838 signatures eligible for verification pursuant to § 19-121.01(A).

2.  Issues raised on appeal

**¶29**　　　　In supplemental briefing to this Court, the parties contested the method used by the trial court for determining the final number of valid signatures.　The Committee argued that the trial court improperly permitted Plaintiffs to strike signatures pursuant to challenges under § 19-122(C) and then also "benefit from the invalidity rate calculated by the County Recorders' random sample," which was not part of Plaintiffs' challenge.[4]　The Committee argued that, in effect, Plaintiffs were "mix[ing] two processes together" without statutory authority.　Plaintiffs argued that permitting a review of valid signatures by the Secretary and county recorders and also permitting a challenge to valid signatures in a court action, which Plaintiffs characterized as a "parallel review," has "been the practice in Arizona for decades."

3.  Statutory framework

**¶30**　　　　Statutes governing the process for placing an initiative on a general election ballot, from requesting a serial number to circulate petitions to the final determination of whether the initiative qualifies for the ballot, including challenges to the process such as §§ 19-118(F) and -122(C), are all set forth at A.R.S. chapter 1, title 19.　Given that these statutes "address the same subject or general purpose," we read them as a whole, "harmoniz[ing] when possible." *Lagerman v. Arizona State Ret. Sys.*, 248 Ariz. 504, 507 ¶ 13 (2020); *see also David C. v. Alexis S.*, 240 Ariz. 53, 55 ¶ 9 (2016).　Likewise, "[w]e interpret statutory language in view of the entire text, considering the context and related statutes on the same subject." *Molera v. Hobbs*, 250 Ariz. 13, 24 ¶ 34 (2020) (alteration in original) (quoting *Ariz. Chapter of the Associated Gen. Contractors of Am. v. City of Phoenix*, 247 Ariz. 45, 47 ¶ 7 (2019)); *State ex rel. DES v. Pandola*, 243 Ariz. 418, 419 ¶ 6 (2018) ("When 'statutes relate to the same subject or have the same general purpose . . . they should be read in connection with, or should be construed together with other related statutes, as though they constituted one law.'" (alteration in original) (quoting *State ex rel Larson v. Farley*, 106 Ariz. 119, 122 (1970))); *Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017) (same); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 252–55 (2012) (addressing the related-statutes canon and the need to

---

[4] "Any citizen may challenge in the superior court the certification made by a county recorder pursuant to § 19-121.02 . . . ." A.R.S. § 19-121.03(B).

read statutes relating to the same subject together).

4. Analysis

**¶31** The Committee cited *Leach v. Reagan*, 245 Ariz. 430 (2018), and *Leach v. Hobbs*, 250 Ariz. 572 (2021), to support the argument that Plaintiffs may not mix processes by challenging the validity of signatures and taking advantage of the county recorder verification process to determine the ultimate number of valid signatures. *Leach v. Reagan* involved a broad challenge to individual signatures which, if successful, would have left the initiative short of the required number of signatures. 245 Ariz. at 433 ¶ 7, 439 ¶ 44. But, as the Committee acknowledged in its briefing, "[n]o party requested and the courts did not apply any invalidity rate to the petition signatures under A.R.S. § 19-121.02 or § 19-121.04." Thus, the Court focused on the total number of signatures challenged and had no cause to consider the application of the invalidity rate. *See Leach v. Reagan*, 245 Ariz. at 442 ¶ 58. To the extent the Court stated that Plaintiffs were required to prove a sufficient number of signatures were invalid by clear and convincing evidence, the authority cited merely established the burden of proof, not an exclusive method of challenging and calculating the number of valid signatures. *Id.* at 437 ¶ 30.

**¶32** Similarly, in *Leach v. Hobbs*, the total number of valid signatures was less than the required amount—221,536 versus 237,645— prior to any consideration of the invalidity rate. 250 Ariz. at 575 ¶ 12. The Court's analysis focused on the disqualification of signatures pursuant to § 19-118(E). *See id.* at 575–78 ¶¶ 14–27. So, as in *Reagan*, we did not consider the invalidity rate or its application. Here, from the outset Plaintiffs contested the initiative's qualification for the ballot by challenging the number of valid signatures within the specific context of the calculation set forth in § 19-121.04.

**¶33** Furthermore, in *Reagan*, the Court concluded that "[w]e are not persuaded that permitting a challenge that encompasses signatures outside the random sample would be so unworkable that the legislature could not have intended to authorize it." 245 Ariz. at 442 ¶ 57.

¶34          Neither § 19-118(F) nor § 19-122(C) requires a challenger to elect an exclusive statutory challenge to an initiative, nor does either statute provide for a method of calculating valid signatures aside from what is set forth in § 19-121.04.   "It is a basic principle that courts will not read into a statute something which is not within the manifest intention of the legislature as indicated by the statute itself."   *Town of Scottsdale v. State ex rel. Pickrell*, 98 Ariz. 382, 386 (1965).   "Also, a court will not inflate, expand, stretch or extend a statute to matters not falling within its expressed provisions."   *City of Phoenix. v. Donofrio*, 99 Ariz. 130, 133 (1965).

### a.   Removal of signatures based on circulator

¶35          Section 19-121.04(A) provides the method for calculating the number of valid signatures to qualify an initiative for the ballot "after . . . the certification of each county recorder."   The first step is to subtract signatures removed by the county recorders pursuant to § 19-121.01(A)(1) from the initial total of eligible signatures. § 19-121.04(A)(1).   This review, which mirrors the Secretary's initial review, requires the removal of signatures on "sheets on which the circulator is required to be registered with the [Secretary] pursuant to § 19-118 and the circulator is not properly registered at the time the petitions were circulated."   § 19-121.01(A)(1)(h).

¶36          In a manner similar to the review by the Secretary and county recorders, individuals may challenge the registration of circulators pursuant to § 19-118(F) on the same bases for which the Secretary and county recorders disqualify signatures.   However, although § 19-121.04(A)(1) specifically provides for subtracting these disqualified signatures after the county recorders' review, the statute is silent concerning how to calculate signatures disqualified by a successful challenge under § 19-118(F).   Other provisions in § 19-118 provide guidance, though.

¶37          Section 19-118(A), for example, requires the Secretary to "disqualify all signatures collected by a circulator who fails to register pursuant to this subsection as provided for in § 19-121.01, subsection A." Likewise, "[i]f a registered circulator is properly served with a subpoena to provide evidence in an action regarding circulation of petitions and fails to

appear or produce documents as provided for in the subpoena, all signatures collected by that circulator are deemed invalid." § 19-118(E). Furthermore, "[t]he party serving the subpoena may request an order from the court directing the [Secretary] to remove any signatures collected by the circulator as provided for in § 19-121.01, subsection A." *Id.* Finally, § 19-118(G) states: "[t]he removal or disqualification of any one or more circulators does not invalidate the random sample of signatures made pursuant to § 19-121.01, and the [Secretary] shall not be required to conduct any additional random sampling of signatures."

¶38 Reading these provisions together, we conclude that the disqualification of signatures under the respective subsections of § 19-118 results in the removal of signatures from the total number of eligible signatures as provided by § 19-121.04(A)(1). Otherwise, there would be no need to preclude any redetermination of the random sample, which would otherwise render § 19-118(G) superfluous. *Fann*, 251 Ariz. at 434 ¶ 25 ("We also avoid interpreting a statute in a way that renders portions superfluous."). Subtracting signatures disqualified pursuant to § 19-118(F) in the same manner as those disqualified on similar bases by the Secretary and county recorders harmonizes § 19-118's provisions and the requirements of § 19-121.04(A)(1).

¶39 We therefore conclude that signatures invalidated under § 19-118(F) must be included in the signatures subtracted from the total of eligible signatures pursuant to § 19-121.04(A)(1).

b. *Disqualification of individual signatures*

¶40 The next step involves subtracting signatures invalidated by county recorders for other reasons. § 19-121.04(A)(2). Other reasons signatures may be deemed ineligible include "[n]o residence address or description of residence location," § 19-121.02(A)(1), "[t]he individual was not a qualified elector on the date of signing the petition," § 19-121.02(A)(5), or for duplicate signatures, § 19-121.02(A)(8). The county recorders' review thus mirrors the Secretary's. § 19-121.02(A)(11) (providing that county recorders shall disqualify signatures "[f]or the same reasons any signatures or entire petition sheets could have been removed by the

15

secretary of state pursuant to § 19-121.01, subsection A, paragraph . . . 3").

¶41 Similarly, § 19-122(C) permits challenges to individual signatures by providing that "[a]ny person may contest the validity of an initiative" based on a failure to comply with chapter 1, title 19, which includes provisions governing the validity of petition signatures for initiatives. For example, § 19-112(A) requires that a "qualified elector shall sign his first and last names in the spaces provided . . ., print his first and last names and write . . . the signer's residence address, giving street name and number, and if he has no street address, a description of his residence location" and provide "the date on which the elector signed the petition." Section 19-115(B) prohibits a person from "knowingly sign[ing] his name more than once for the same measure . . . at one election" or failing to be "a qualified elector" at the time of signing.

¶42 Accordingly, by reading the provisions addressing the validity of signatures together as a whole and giving effect to § 19-122(C), as we did with § 19-118(F), we conclude that signatures adjudicated ineligible due to challenges brought by individuals are to be subtracted from the total of eligible signatures like signatures that are removed by county recorders under § 19-121.04(A)(2).

¶43 In harmonizing the provisions of chapter 1, title 19, and reading them together in addressing the circulation and qualification of initiative petitions, we are mindful of the legislature's duty to enact measures to maintain the integrity of the initiative process while also protecting the people's reserved power to make law through the initiative. Ariz. Const. art. 7, § 12 ("There shall be enacted registration and other laws to secure the purity of elections and guard against abuses of the elective franchise."). Ensuring that invalid petition signatures are disqualified, whether by election officers' review or individual challenges, is essential to maintaining the integrity of the process and ensuring that only properly qualified initiatives are presented to the people.

c. *Invalidity rate*

**¶44**  We next determine the invalidity rate by calculating "the percentage of all signatures found to be invalid in the random sample." § 19-121.04(A)(3). No other method for determining the invalidity rate is provided for in any other statute. This has two consequences for the case before us.

**¶45**  First, in deciding how to address the 412 signatures that were deemed ineligible by county recorders and also adjudicated invalid by the trial court, the court—at the parties' suggestion—"restored" 412 of the signatures by adding them to the number determined valid by county recorders. Then, the court recalculated the invalidity rate based on the adjusted number of valid/invalid signatures. Such an adjustment to the county recorder verification is not provided for in any statute. *See* § 19-118(G) (precluding adjustment of the random sample of signatures used for calculating the invalidity rate even where circulator petition sheets are subsequently deemed invalid). The only way to alter the calculation of the validity rate from the random sample is to successfully challenge the county recorders' determination of valid and or invalid signatures under § 19-121.03. *See Leach v. Reagan*, 245 Ariz. at 441 ¶ 54 (noting that a challenge under § 19-121.03 to the county recorders' certifications, "if successful, would change the validity rate").

**¶46**  Second, in its argument for the proper calculation of the number of valid signatures to qualify for the ballot, the Committee proposes utilizing invalidity rates calculated on the basis of each voter registration objection alleged by Plaintiffs.[5] For example, Plaintiffs challenged the validity of signatures furnished on a petition sheet prior to when the signer was registered to vote. Accordingly, the Committee would take the number of invalid "pre-registration" signatures as determined by the county recorders' review from the random sample, calculate an invalidity rate on this basis (dividing the number of identified pre-registration signatures by the random sample total), and then apply it

---

[5] This calculation method was also proposed by Plaintiffs and used by the trial court to determine the final number of valid signatures, though it was not dispositive in the court's amended final judgment.

to the total of eligible signatures to determine how many signatures to subtract.

¶47        The Committee argues that this approach is consistent with § 19-122(C), permitting challenges to signatures under chapter 1, title 19.[6] However, calculating a subset of invalidity rates based on categories of signature objections does not accord with the procedure set forth by the legislature.   § 19-121.04(A)(3) (providing that the invalidity rate is determined as a percentage of "all signatures found to be invalid in the random sample").   We decline to use such an approach.

d. *Final calculation*

¶48        The last step is to determine whether there are sufficient valid signatures to qualify an initiative for the ballot after applying the invalidity rate and deducting the number of invalid signatures from the total eligible signatures remaining.   *See* § 19-121.04(A)(3).

5. Application and determination

¶49        We now apply the statutory calculation methodology to the facts presented in this case.   The initial total of eligible signatures as determined by the Secretary pursuant to § 19-121.01 is 399,838.   The total number of signatures deemed ineligible by county recorders is 4,852.   While the total number of stipulated signatures adjudicated invalid is 96,237, 412 of those signatures are duplicative of those deemed ineligible by county recorders.   We therefore reduce the number *adjudicated* invalid by 412, leaving 95,825.   The total number of invalid signatures as determined by county recorders and adjudicated by the trial court is thus 100,677.   Subtracting that number from the total number of eligible signatures leaves 299,161.

¶50        The invalidity rate is determined by dividing the number of invalid signatures, 4,852, by the total number of signatures in the random sample, 19,992.   This results in an invalidity rate of 24.27%.   Applying this

---

[6] Applying this approach would contribute to a result in which there would be enough valid signatures to qualify the Act for the ballot.

invalidity rate to the number of eligible signatures (.2427 $x$ 299,161) results in 72,606 invalid signatures. Subtracting this total from 299,161 leaves 226,555 valid signatures, which is less than the 237,645 required.

**¶51** We acknowledge that, at least with respect to deducting signatures found invalid by county recorders and then using the same number as the numerator in determining the invalidity rate, this method seems to permit "double counting" of invalid signatures. This was noted by the Court in *City of Flagstaff v. Mangum*, 164 Ariz. 395, 404 (1990) ("We recognize that the method we have set forth will still result in a percentage of the invalid signatures in the random sample being deducted twice."). Nevertheless, then as now, "such deduction appears clearly mandated by the statute." *Id.* And the people, acting in concert with the legislature, have seen fit to accommodate the need to maintain the integrity of the initiative process with the reality of available time and personnel to create the system we have.

**¶52** Our colleague's partial dissent offers plausible alternatives for calculating the final number of valid signatures. However, the methods set forth do not fully account for all the applicable statutes. Nevertheless, we agree that an explicit process established by the legislature that specifically accounts for the various reviews by elections officials and challenges by individuals would be of great utility for initiative proponents, challengers, and courts alike.

### III. CONCLUSION

**¶53** Because the Act falls short of the required number of valid signatures, we affirm the trial court's amended final judgment disqualifying the initiative from the ballot.

MUSSI, ET AL. V. KATIE HOBBS/ADRC ACTION
VICE CHIEF JUSTICE TIMMER, Concurring in part, Dissenting in part,
and Dissenting in the result

TIMMER, VCJ., Concurring in part, Dissenting in part, and Dissenting in the result.

**¶54** The legislature provides two distinct methods for determining whether the constitutionally required number of valid petition signatures supports placing an initiative on the ballot, which I describe as a "projected-count method" and an "actual-count method." The majority blends the two to create a hybrid calculation method that is unsupported by our laws. Because the plaintiffs did not prove that Arizonans for Free and Fair Elections (ADRC Action) (the "Committee") lacked enough valid signatures using an authorized methodology, I would have permitted the Arizona Fair Elections Act initiative to be placed on the November 8, 2022 General Election ballot. Thus, although I agree with my colleagues' resolution of the first and second appeals, *see supra* ¶¶ 10–25, I respectfully disagree with their resolution of the final appeal, *see supra* ¶¶ 26–53.

### A. The "projected-count" method

**¶55** The legislature requires the Secretary and county recorders to use a prescribed process to verify that a requisite number of valid signatures supports placing an initiative on the ballot. A.R.S. §§ 19-121.01 to -121.04. After discarding statutorily non-compliant petition sheets, the Secretary must identify the number of signatures eligible for verification. § 19-121.01(A). The Secretary next randomly selects a 5% sample from those eligible signatures for verification by county recorders in the counties where the signatories claim to be qualified electors. § 19-121.01(B). The county recorders then check each signature in the sample and certify the number disqualified for statutorily enumerated reasons. § 19-121.02(A)–(B). This process also yields an invalidity percentage rate. § 19-121.04(A)(3).

**¶56** After receiving the county recorders' certifications, the Secretary must determine the total number of valid signatures by subtracting from the total number of eligible signatures, in this order: (1) all signatures removed by the county recorders for same reasons the Secretary

MUSSI, ET AL. V. KATIE HOBBS/ADRC ACTION
VICE CHIEF JUSTICE TIMMER, Concurring in part, Dissenting in part,
and Dissenting in the result

was required to remove signatures pursuant to § 19-121.01(A)(1); [7] (2) all other signatures found ineligible by the county recorders; and (3) a like invalidity percentage of the remaining signatures. § 19-121.04(A). If the final number equals or exceeds the constitutionally required number of signatures, the initiative is placed on the ballot. § 19-121.04(B). Persons may sue the county recorders to challenge their certifications and, if successful, an adjusted invalidity rate is used to estimate the number of valid signatures. § 19-121.03(B); *Leach v. Reagan*, 245 Ariz. 430, 441 ¶ 54 (2018). Persons may also file a lawsuit to contest the validity of an initiative based on the Secretary's actions. A.R.S. § 19-122(C).

**¶57** This projected-count method does not individually verify every petition signature but instead projects the total number of valid signatures. § 19-121.04(C) (describing the calculated number as a projection). Undoubtedly, the legislature chose this method because the Secretary and the county recorders would struggle to verify every signature on multiple initiative efforts during an election cycle's compressed time frame. Indeed, in 2011, the legislature discontinued former § 19-121.04(C)'s requirement that the Secretary "order the examination and verification of each signature" if the projected number of valid signatures falls between 95 and 105% of the constitutionally required minimum. 2011 Ariz. Sess. Laws ch. 332, § 26 (1st Reg. Sess.).

---

[7] Section 19-121.04(A)(1) is confusing. Before applying that subsection, the Secretary starts with the total number of eligible signatures used as a basis for calculating the 5% random sample sent to the county recorders for verification. § 19-121.04(A). The Secretary determines the number of those eligible signatures, in part, by removing signatures pursuant to § 19-121.01(A)(1). So why does § 19-121.04(A)(1) again require removal of signatures pursuant to § 19-121.01(A)(1)? That should have been done. To avoid rendering § 19-121.04(A)(1) hopelessly murky, both the majority and I interpret it as referring to signatures missed by the Secretary under § 19-121.01(A)(1) and so removed by the county recorders. *See supra* ¶ 35. Indeed, § 19-121.02(A)(11) directs county recorders to perform this failsafe function.

MUSSI, ET AL. V. KATIE HOBBS/ADRC ACTION
VICE CHIEF JUSTICE TIMMER, Concurring in part, Dissenting in part,
and Dissenting in the result

**¶58** Applying the projected-count method here, it is undisputed that the Committee provided enough valid signatures supporting placement of the initiative on the ballot. The Secretary identified 399,838 signatures eligible for verification. *See* § 19-121.01(A). From this number, she randomly selected 19,992 signatures as the 5% sample and sent them to the county recorders for verification. *See* § 19-121.01(B). After checking each signature, the county recorders certified that 4,852 signatures were disqualified, leaving 15,140 valid signatures.[8] *See* § 19-121.02(A)-(B). This yielded an invalidity rate of 24.27% (4,852 ÷ 19,992). Subtracting the 4,852 invalid signatures from 399,838, the total number of eligible signatures, equals 394,986. Subtracting a like percentage of invalid signatures from the remaining signatures equals 299,123 valid signatures (394,986 – (.2427 × 394,986)), which exceeded the 237,645 signatures constitutionally required to qualify the initiative for the ballot. *See* Ariz. Const. art. 4, pt. 1, § 1(2), (7). Consequently, the Secretary determined that the initiative qualified for the ballot.

**¶59** For ease of understanding, here is the calculation using the projected-count method:

| | | |
|---|---|---|
| Total eligible signatures: | | 399,838 |
| Random sample (.05 × 399,838) | 19,992 | |
| Invalidated signatures | 4,852 | |
| Invalidity percentage rate<br>(4,852 ÷ 19,992) | 24.27% | |
| Less signatures invalidated by county recorders | | <4,852> |
| | | 394,986 |
| Less remaining signatures invalidated<br>by like percentage (.2427 × 394,986) | | <95,863> |

---

[8] These numbers include twelve signatures rehabilitated in another lawsuit. *See Mabry v. Hobbs*, No. CV2022-010956 (Maricopa Cnty. Super. Ct., Aug. 25, 2022).

MUSSI, ET AL. V. KATIE HOBBS/ADRC ACTION
VICE CHIEF JUSTICE TIMMER, Concurring in part, Dissenting in part,
and Dissenting in the result

**Total projected valid signatures**                 **299,123**

## B. The actual-count method

¶60        The legislature separately authorizes persons to file a lawsuit challenging that enough valid petition signatures actually exist to qualify an initiative for the ballot. § 19-122(C); *Leach v. Reagan*, 245 Ariz. at 442 ¶¶ 56–57. This is the basis for the plaintiffs' challenge. Like the case here, *see supra* ¶¶ 5–8, these challenges often involve expedited and logistically complex trials, where plaintiffs seek to disqualify batches of signatures or individual signatures for statutorily prescribed reasons. *See, e.g., Leach v. Reagan*, 245 Ariz. at 433 ¶ 10 (striking "signatures gathered by more than 300 circulators" who did not comply with subpoenas to appear for trial, *see* A.R.S. § 19-118(C), or who "violated statutory requirements when [collecting] signatures," *see* A.R.S. §§ 19-112(A), -114(A)); *id.* at 440 ¶ 49 ("[I]n a Herculean effort, Plaintiffs reviewed all petition signatures, challenged 384,459 signatures based on twenty-seven categories of purported deficiencies, and subpoenaed more than 1100 circulators to testify."); *see also* § 19-118(F) (providing that "[a]ny person may challenge the lawful registration of circulators in the superior court"). If those challengers prove by clear and convincing evidence that initiative sponsors did not actually gather enough valid signatures, the court must enjoin placement of the initiative on the ballot. *See Leach v. Reagan*, 245 Ariz. at 437 ¶ 30.

¶61        My application of the actual-count method reveals both my view that the plaintiffs failed in their challenge here and my disagreement with the majority. Starting with the 399,858 signatures identified by the Secretary as eligible for verification,[9] I subtract 96,237 signatures, which the parties had stipulated were disqualified by plaintiffs' successful objections; subtract the 4,852 signatures disqualified by the county recorders; and add

---

[9] As the majority notes, the parties and the trial court overstated the number of eligible signatures by twenty. *Supra* ¶ 27 n.3. The parties stipulated to this incorrect number and the trial court accepted it, so I use that figure here. But because that stipulation could not bind the Secretary, I used the correct number when discussing the projected-count method previously described. *See supra* ¶¶ 58-59.

MUSSI, ET AL. V. KATIE HOBBS/ADRC ACTION
VICE CHIEF JUSTICE TIMMER, Concurring in part, Dissenting in part,
and Dissenting in the result

412 signatures to adjust for duplication between the stipulated disqualifications and the county recorders' disqualifications. This results in 299,181 valid signatures, which is extremely close to the Secretary's projected-count total. *See supra* ¶¶ 58-59. None of the disqualified signatures are projections; each was individually examined and disqualified. But like the projected-count total, the actual-count total exceeds the constitutional minimum necessary to qualify the initiative for the ballot.

**¶62**    Here is the calculation:

| | |
|---|---|
| Total eligible signatures: | 399,858 |
| Less signatures disqualified in lawsuit | <96,237> |
| Less signatures disqualified by county recorders | <4,852> |
| Plus duplicated disqualified signatures | 412 |
| **Total valid signatures** | **299,181** |

**¶63**    The majority uses the same methodology to this point (except it uses the Secretary's number of total eligible signatures and not the stipulated number). *Supra* ¶ 49. But it then applies the invalidity percentage rate established in the projected-count method to further reduce the total to a total below the constitutionally required minimum. *Supra* ¶ 50. In my opinion, this is a mistake.

**¶64**    First, neither §§ 19-118(F), -122(C) nor any other statute authorizes initiative challengers to prove their case by using any part of the projected-count method, including the invalidity percentage rate. Sections 19-121.01 through 19-121.04 direct procedures only for the Secretary and county recorders; they do not mention or concern challenges made pursuant to § 19-122(C). And the plaintiffs here do not contest the Secretary's actions. The majority does not adequately explain why the plaintiffs are authorized to use the Secretary's projection tool—the invalidity percentage rate—to establish the actual number of disqualified

MUSSI, ET AL. V. KATIE HOBBS/ADRC ACTION
VICE CHIEF JUSTICE TIMMER, Concurring in part, Dissenting in part,
and Dissenting in the result

signatures. It simply defaults to using this tool because the legislature permits the Secretary to use it as part of the projected-count method and it would "harmonize" provisions that, as described above, are not discordant. *Supra* ¶¶ 30, 34–35, 42-43.

**¶65** Second, the majority's method permits challengers to use the invalidity percentage rate to create a new projected-count method that is inconsistent with the one created by the legislature. Section 19-121.04(A) directs the Secretary to first subtract from the eligible signatures all signatures disqualified by the county recorders and then subtract a like invalidity percentage of the remaining signatures. But under the majority's method, the court subtracts the signatures disqualified by the county recorders *and* additional signatures adjudicated disqualified *and then* applies the invalidity percentage rate to the remainder. The total is necessarily a projected count because the court did not examine each disqualified signature for compliance. And, most significantly, it results in a greater reduction than contemplated by § 19-121.04(A). The legislature created a projected-count method, embodied by §§ 19-121.01 through 19-121.04. We should leave it to the legislature if it wishes to create another one.

**¶66** Third, and relatedly, the majority's use of the invalidity percentage rate lessens the plaintiffs' burden to prove that the Committee failed to strictly comply with the initiative statutes. *See* A.R.S. § 19-101.01 (requiring strict compliance); § 19-122(C) (authorizing action to challenge strict compliance). As described, applying the rate to all eligible remaining signatures results in a total that only projects the number of valid signatures, it does not tally the actual number. By its nature, a projection cannot satisfy the challenger's burden to prove by clear and convincing evidence that an initiative fails to strictly comply with the statutes, resulting in an insufficient number of signatures to qualify for the ballot. *See Leach v. Reagan*, 245 Ariz. at 437 ¶ 30 (describing the burden of proof). This flaw is particularly acute when, as here, the majority's projected number falls just short of the constitutional minimum.

MUSSI, ET AL. V. KATIE HOBBS/ADRC ACTION
VICE CHIEF JUSTICE TIMMER, Concurring in part, Dissenting in part,
and Dissenting in the result

¶67 Fourth, applying the invalidity percentage rate results in double counting. By deducting the signatures disqualified by the county recorders and also applying the invalidity percentage rate to the total number of eligible signatures initially identified by the Secretary, disqualified signatures are counted twice. Here, the county recorders invalidated 4,852 signatures, which formed the basis for the invalidity percentage rate. By subtracting those signatures *and* applying the invalidity percentage rate to a signature set that includes the 4,852 signatures, those signatures are counted twice. Admittedly, this Court has recognized that § 19-121.04(A)'s application of the invalidity percentage rate results in this double-deduction. *City of Flagstaff v. Mangum*, 164 Ariz. 395, 404 (1990). But even though the Court concluded that this consequence is "clearly mandated by the statute" in directing the Secretary's actions, *id.*, I see no reason to permit plaintiffs to take advantage of this counting flaw, and the majority offers none.

¶68 In sum, I would have reversed the superior court's judgment and instructed it to enter a judgment directing the Secretary to qualify the initiative for the ballot. This is, by no means, an obvious result, as demonstrated by the several different calculation methods used by the trial court, the parties, the majority, and me, all of which are purportedly based on the same statutes. The legislature has clearly authorized persons to challenge placing initiatives on the ballot in ways other than challenging the Secretary and the county recorders' actions, *see* §§ 19-118(F), -122(C), but unfortunately it has not provided a clear procedural path for doing so. As a result, parties, attorneys, and judges are left to read, re-read, and re-read again the statutes to identify that path. The stakes are high as getting it wrong would divest the voting public of its valuable right to self-govern. The legislature would serve the public good by clarifying its statutes on these points.